In re Helen **COSTELLO,** Debtor.

**Bankruptcy No. 93–229–8P7.**

United States Bankruptcy Court,
M.D. of Florida,
Tampa Division.

April 24, 1995.

D. Turner Matthews, Bradenton, FL, for debtor.

V. John Brook, Jr., Trustee, St. Petersburg, FL.

Dennis Levine, Tampa, FL, for trustee.

Larry Foyle, Tampa, FL, Michael A. Moran, Sarasota, FL, for movant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND MEMORANDUM OPINION

ALEXANDER L. PASKAY, Chief Judge.

THIS IS a Chapter 7 case and the matter before the court is the objection by the Debtor, Helen Costello (Debtor), to two claims filed by Victor Levine (Levine). The first claim was timely filed on May 20, 1993, and is based on a deficiency claim remaining after the mortgages encumbering two of the three properties were foreclosed and ultimately purchased by Levine at the foreclosure sale. The second claim by Levine was filed after the bar date and seeks damages including attorney fees and costs based on breach of contract and fraud. Because this claim was untimely, Levine seeks payment pursuant to section 726(a)(3) as a subordinated claim to be paid only from surplus funds of the estate, thus before any of the remaining funds are returned to the Debtor.

The Objection under consideration is not filed by the Trustee but by the Debtor. As a general rule a Chapter 7 debtor is not a "party in interest" for purposes of section 502(a) and therefore lacks standing to file an objection to a claim. *In re Coleman,* 131 B.R. 59 (Bankr.N.D.Tex.1991). However, there is a recognized exception to this rule. When it appears that if the contested claims are disallowed there will be a surplus in the estate which may be returned to the debtor, the debtor has a cognizable pecuniary interest in the funds of the estate and therefore has standing to contest claims. *In re Fingers,* 170 B.R. 419, 425 (Bankr.S.D.Cal.1994).

The facts relevant to the claims under consideration as established by the record are as follows:

In May of 1990, Levine, a citizen of the United Kingdom, learned from a newspaper article that Debtor's property located at 5440 Gulf of Mexico Drive in Longboat Key (Gulf of Mexico property) was for sale. This property is a very deep lot and abuts on the Gulf of Mexico in the rear. Levine was interested in the rear portion, which was zoned residential, as opposed to the front portion which was zoned commercial. The commercial portion was occupied at the time by a tenant, Mr. Harvey Backer (Backer), who indicated a desire to purchase this portion. Levine and Backer made a joint offer to purchase the property, but the Debtor refused the offer.

Four or five months later, the Debtor contacted Levine in England and indicated that she was very interested in selling the property. Levine returned to the U.S. to discuss the purchase of the Gulf of Mexico property by him alone, as Backer was no longer interested in buying any portion of the property. The parties disagreed as to the value of the property because each had a different opinion as to the number of homes that could be built on the lot. On November 30, 1990, they eventually came to an agreement and Levine signed a contract to purchase the property for $430,000.00 plus $40,000.00 for each additional home beyond the first one that Levine was able to build. This contract specifically recognized the existence of a first mortgage encumbering the property securing a debt held by the Resolution Trust Company in the approximate amount of $400,000.00.

By December of 1990, the Debtor ran into severe financial problems. A mortgage holder, Mr. Famiglio (Famiglio), was threatening to foreclose the mortgages on five of the Debtor's properties, including a home located at 875 Tarawitt Drive (875 Tarawitt) and a vacant lot at 853 Tarawitt Drive (853 Tarawitt), also located on Longboat Key. Unable to get a loan elsewhere, the Debtor solicited Levine for a $250,000.00 bridge loan to hold off the foreclosure on these properties. The

Debtor assured Levine that the Gulf of Mexico property would close as planned and that the loan would be repaid from the proceeds. Levine therefore agreed to the $250,000.00 loan, which was accomplished through the following steps.

First, the contract on the Gulf of Mexico property was amended. Levine agreed to pay $45,000.00 up front in lieu of the additional payments of $40,000.00 per buildable lot. This reduction reflected an unfavorable environmental survey which reported that it was unlikely that more than three houses could be built on the property because of protected mangroves and wetland areas. Additionally, it was agreed that Levine's $43,000.00 deposit previously held in escrow could be applied to the Debtor's outstanding indebtedness to Famiglio.

Second, the Debtor executed a note and mortgage on December 13, 1990. The note was in the amount of $250,000.00 and was payable in full on January 31, 1991. The note was interest free until the maturity date, but called for the highest rate permitted by law after default. The mortgage encumbered three properties, with a first mortgage on both 853 Tarawitt and 875 Tarawitt, and a second mortgage on Gulf of Mexico property. The proceeds for this loan consisted of the $43,000.00 deposit already advanced by Levine toward the Gulf of Mexico property and an additional $207,000.00 which was actually disbursed by Levine.

Finally, Levine agreed to purchase the vacant lot at 875 Tarawitt, which the Debtor had offered to Levine for $100,000.00. A contract for sale and purchase was signed. The contract fixed $145,000.00 as the total price which is the price asked and the $45,000.00 agreed to be paid by Levine as a buyout of the additional lot premium provision on the Gulf of Mexico property contract. The closing was scheduled for the later of March 31, 1991, or when the Gulf of Mexico property closed. The contracts on both the Gulf of Mexico property and 875 Tarawitt were recorded.

After the loans were closed, the titles on the properties were encumbered by the following liens:

*875 Tarawitt*

1) Taxes of $24,000.00
2) Levine's purchase contract for $145,000.00
3) Levine's mortgage of $250,000.00 (cross collateralized with the properties at Gulf of Mexico and 853 Tarawitt)

*853 Tarawitt*

1) Taxes of $27,000.00
2) Levine's mortgage of $250,000.00 (cross collateralized with Gulf of Mexico property and 875 Tarawitt)

*5440 Gulf of Mexico*

1) Taxes of $18,000.00
2) RTC loan of $450,000.00 (cross collateralized with property at 300 N. Tamiami Trail)
3) Levine's purchase contract for $430,000.00
4) Levine's mortgage of $250,000.00 (cross collateralized with the properties at 853 Tarawitt and 875 Tarawitt)

Neither of the sales contracts ever closed. The entire balance of the $250,000.00 loan became due and payable on January 31, 1991, with interest accruing post-maturity at 18%. As no payment was ever made, Levine embarked on the task of trying to foreclose his mortgage which turned out to be very arduous and frustrating.

On December 27, 1991, the Circuit Court for Manatee County entered a Final Judgment holding that Levine was entitled to the foreclosure of his mortgage. The amount of the judgment in foreclosure was $250,000.00 in principal, plus $39,328.77 in interest accrued at the rate of 18% per annum from January 31, 1991, to the date of the final hearing, December 16, 1991, plus $123.29 per diem interest to the date of judgment, plus $420.00 in costs, with the total amount due bearing interest post-judgment at 12% per annum. The court also awarded Levine reasonable attorneys' fee and retained jurisdiction to assess such fees and any deficiency judgment that may be necessary.

Levine's victory turned out to be a pyrrhic one, indeed, and enforcing the judgment proved to be no easy feat. Several scheduled foreclosure sales were stayed by the Debtor's

repeated automatic stay triggered by repeated Petitions for Relief filed by the Debtor not only in this Court but also in the Orlando Division of this District but also in, of all places, the Northern District of Georgia. Needless to say, all of these cases were ultimately dismissed. The Debtor's individual history with the Bankruptcy Courts is chronicled by this Court in the Order on Motion for Sanctions entered against the Debtor on October 17, 1994. Nevertheless, despite the Debtor's best efforts to hold on to her property, three foreclosure sales were ultimately concluded.

The first sale occurred on November 12, 1992, and Levine was the successful bidder for all three parcels with a total bid of $111,000.00 This sale was voided by the Circuit Court for reasons not explained and it is impossible to discern from the available record.

A second foreclosure sale was conducted in April, 1993. This time the Debtor outbid Levine on each of the three parcels by $1,000.00. However, as she was unable to pay the bid price, the Debtor forfeited her $3,000.00 deposit when the sale aborted. Levine was again forced to apply for a new sale date. In order to assure that the Debtor would not frustrate and sabotage the sale, Levine obtained an Order from the Circuit Court which ordered that if the winning bid at the third sale was not a sincere bid, the property would be sold to the next highest bidder.

The third sale took place on May 19, 1993. At this time the final judgment of foreclosure grew from the original amount to the following:

| | |
|---|---|
| Principal | 250,000.00 |
| Interest—18% to 12/16/91 | 39,328.77 |
| Interest—11 days at $123.29 | 1,356.19 |
| Costs | 420.00 |
| Total | 291,104.96 |
| Post–Judgment Interest at 12% 497 days at $95.71 per diem | 47,567.87 |
| Total | 338,672.83 |
| Plus Reasonable Attorney's Fees | |
| Fuller | 22,881.50 |
| Hudnel | 3,425.00 |
| Total | 364,979.33 |

Levine was the successful bidder at the sale, with a total bid price for all three properties of $351,000.00 and Levine obtained the title

from the Clerk of the Circuit Court in due course.

On June 17, 1993, Levine sold the two properties on Tarawitt Drive. After deducting for the payment of back taxes and closing costs, Levine netted approximately $257,370.00 on the two sales. The Gulf of Mexico property on which Levine had a second position behind the RTC mortgage is still the subject of litigation. However, according to Levine the value of Gulf of Mexico property is insufficient to cover the first mortgage, and therefore his second mortgage is of no value.

Based on the foregoing, Levine contends that the value of the property purchased by him at the foreclosure sale was not his bid price, that is the $351,000.00, but the price he obtained in reselling the property a month later for $257,370.00. Accordingly, it is Levine's position that he has an allowable unsecured claim for the deficiency which is the difference between the amount owed on his mortgage, that is $364,979.33, and $257,370.00, or $107,609.33. In addition, Levine also claims that he should be permitted to have an unsecured claim allowed which is concededly untimely yet still entitled to distribution pursuant to § 726(a)(3) which provides that tardy claims must be paid in full before any remaining funds can be paid to the Debtor pursuant to § 726(a)(6). This claim is based on the alleged damages Levine suffered based on the breach of contract and fraud in connection with his dealings with the Debtor.

■ It should be pointed out at the outset that the Bankruptcy Court clearly contemplates that the secured creditor may bifurcate its claim pursuant to § 506(a) of the Code by having allowed its secured claim albeit limited to the extent of the value of the collateral and an unsecured claim for the balance. A deficiency claim of a secured party may be determined by a Court of competent jurisdiction and if that occurs prior to the commencement of a case such determination would ordinarily have a binding effect on the parties. If it did not occur it could be determined in the valuation process in the Bankruptcy Court, pursuant to

§ 506(a) of the Code. There is no requirement that the creditor first obtain a deficiency judgment in the non-bankruptcy forum as a prerequisite for bifurcating a claim into a secured and an unsecured part. Levine did in fact file such a Motion on December 30, 1993. The ultimate question is whether or not Levine is bound by his bid in the State Court foreclosure proceeding because his bid conclusively established the value of the property at $351,000.00 or whether the controlling number should be what Levine sold these properties a month later for, $257,370.00. The difference between $364,979.33 and $257,370.00 is $107,609.33 representing the unsecured claim asserted by Levine. This matter is further complicated, however, by the undisputed facts that Levine also holds a second mortgage on the Gulf of Mexico property junior to the mortgage held by the RTC which should further be deducted from the amount of allowed unsecured deficiency claim of Levine if he has any salvageable equity from this property. Putting this last proposition aside for a moment, this Court is satisfied that, in light of the totality of the circumstances especially surrounding the last sale, Levine's bid for the properties was highly inflated, and totally unrealistic, and was caused by the fact that the Debtor arranged for three persons to appear and act as shills or stalking horses at the sale who were making collusive bids apparently on behalf of the Debtor without any intention to actually buy the property. These charges are supported by the fact that Levine's first bid of $180,000.00 was immediately followed by three bids of $190,000.00, $250,000.00, and $350,000.00, all of which occurred "within two seconds or less." The Debtor does not dispute that these bids were not legitimate. At the October 28, 1994, final evidentiary hearing, the Debtor took the position that the amount of any deficiency should not be determined by the bidding at the sale because there was never an outside party that "bid legitimately at the sale." The proposition advanced by the Debtor is a non-sequitur and does not bear a close analysis. It is a well established proposition that property rights are determined with reference to the applicable local laws. *Butner v. United States,* 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979).

■ The right of a holder of a foreclosure judgment to bid in and purchase the property to assert a deficiency claim has been considered by some Courts of Appeal of this State. The First and Second District Courts of Appeal have adopted the rule that when the amount bid at a foreclosure sale is higher than the fair market value of the property, the amount bid must be applied to the final judgment when determining if a deficiency exists. *Provident Nat'l Bank v. Thunderbird Assoc.,* 364 So.2d 790, 795 (Fla. 1st DCA 1978); *Gottschamer v. August, Thompson, Sherr, Clark & Shafer, P.C.,* 438 So.2d 408, 409 (Fla. 2d DCA 1983). This rule is based upon the holding in *City of Sanford v. Ashton,* 131 Fla. 759, 179 So. 765, 767 (1938)

■ It is without dispute that in the present instance Levine did not seek and obtain a deficiency judgment, thus the cases cited are inapposite and not controlling. Therefore, notwithstanding *Butner,* the allowability of an unsecured claim based on the deficiency is uniquely within the competence and jurisdiction of the Bankruptcy Court and Levine clearly had the right to establish through the bifurcation process available under § 506(a) of the Code any unsecured deficiency claim.

■ The Bankruptcy Code offers no bright line standards to follow when valuing collateral for purposes of section 506(a). Value must therefore be determined on a case by case basis, guided by equitable principles. *Matter of Kids Stop of America, Inc.,* 64 B.R. 397, 401 (Bankr.M.D.Fla.1986).

■ Based on the foregoing, this Court is satisfied that valuation of the two parcels on Tarawitt should be based on the funds that were actually netted from the sale to a third party which occurred one month after the foreclosure sale. It is undisputed that the sale was an arm's-length transaction. Therefore, for purposes of the § 506(a) valuation, the funds received from the sale in the amount of $257,370.00 provide a better measure of value than attempting to apportion a share of Levine's $351,000.00 bid price. When the funds actually received are applied to the total claim amount of $364,979.33, the

amount of the claim unsatisfied is $107,609.33.

 As noted earlier Levine also has a second mortgage on the Gulf of Mexico Property on which the R.T.C. holds the first mortgage. This in turn requires a consideration whether or not Levine's second mortgage represents a salvageable economic value which would be credited against his deficiency claim.

The Gulf of Mexico property is a long narrow piece of property with a non-conforming commercial frontage in place. The property has no access, as a private single home development is located to one side and has refused access, and on the other is located a preserve of mangroves which prohibits access. Finally, the wetlands comprise a total of over an acre of the lot.

At the final evidentiary hearing, the Court was presented with several values for the Gulf of Mexico property. Considering the environmental and zoning restrictions placed on this property, the appraisal provided by the expert for the Debtor, which relied on a straight multiplication of the total number of square feet, usable or not, times a dollar amount to equal of $677,000.00 is clearly unrealistic and places a grossly excessive value on the property. This court is constrained to reject the appraisal of the debtor's expert and, having considered all facts in the record, is satisfied that the value placed on the property by the expert of Levine is more realistic and the amount of $387.000.00 is a fair value of the properties sold at the foreclosure.

Taking judicial notice of the foreclosure judgment entered by the Circuit Court in favor of the first mortgage holder on December 14, 1994, of $623,967.95, this Court is satisfied that the second mortgage held by Levine on the Gulf of Mexico property represents no salvageable economic value. Thus his deficiency claim as determined earlier is in the amount of $107,609.33, and the unsecured claim of Levine is therefore allowed in the amount of $107,609.33.

This leaves for consideration the second claim of Levine which is based on: 1) breach of contract with respect to Levine's proposed purchase of Gulf of Mexico property; 2) fraud in the inducement respecting the Gulf of Mexico property contract; and 3) the Debtor's fraud in obtaining a loan for $250,000.00 from Levine after the formation of the Gulf of Mexico property purchase contract. It should be noted at the outset that the damages sought by Levine for the $250,000.00 are primarily interest and attorney's fees and as such have already been included as a part of the already determined unsecured deficiency claim.

Concerning the damage claim based on the allegation that as a result of the delay the property suffered a loss of value, this record is woefully inadequate to permit such a determination. The burden was clearly on Levine to establish with competent evidence his damages which in this Court's view he failed to do. There is no question that Levine had the duty to mitigate the damages resulting from the breach and certainly could have walked away and abandoned the project which in turn would not have caused any of the incidental damages he is now claiming. Based on the foregoing the tardy claim of Levine has not been established with the requisite degree of proof and therefore should be disallowed.

DONE AND ORDERED.